Filed 9/12/23  P. v. Tucker CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ISAIAH JAMES TUCKER et al.,<br><br>    Defendants and Appellants. | B317092<br><br>(Los Angeles County Super. Ct. Case No. NA111269)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING (No change in the appellate judgment) |
| --- | --- |

THE COURT:

It is ordered that the opinion filed herein on August 22, 2023 be modified as follows:

1.  In the first sentence of the first full paragraph on page 6, following the term muzzle flashes, the following language is inserted:

("the light from the gun")

2.  The third sentence in the second full paragraph on page 6 now reads:  Tucker hid the SUV with friends and relatives.  That sentence is deleted and replaced with the following language:

Tucker left the SUV with friends and relatives, initially in San Bernardino County. It was impounded two weeks later by law enforcement officers.

3. The second and third sentences in the second full paragraph on page 22 now read: Tucker, an Insane Crips gang member, angry at Ross's insult of his gang, chased Ross on foot. He stopped the chase and returned to the bar telling his confederates, "I'm going to get the blower," which Brown interpreted to mean a gun. Those two sentences are deleted and replaced with the following language:

Tucker, an Insane Crips gang member, angry at Ross's insult of his gang, pursued Ross on foot. He stopped and returned to the bar telling his confederates, "I'm going to get the blower," which Brown interpreted to mean a gun.

There is no change in the appellate judgment. Appellants' petitions for rehearing are denied.

---

PERLUSS, P. J.            SEGAL, J.            FEUER, J.

Filed 8/22/23  P. v. Tucker CA2/7 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| THE PEOPLE, | B317092 |
|---|---|
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. Case No. NA111269) |
| v. | |
| ISAIAH JAMES TUCKER et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Laura Laesecke, Judge.  Affirmed.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant Isaiah James Tucker.

Tracy J. Dressner, under appointment by the Court of Appeal, for Defendant and Appellant Phillip Bullard, Jr.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithy, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Eric J. Kohm, Deputy Attorney General, for Plaintiff and Respondent.

—————————————

A jury convicted Isaiah James Tucker and Phillip Bullard, Jr. of first degree premeditated murder and found true specially alleged firearm and criminal street gang enhancements. The court struck the enhancements and sentenced both Tucker and Bullard to indeterminate state prison terms of 50 years to life.

On appeal Tucker and Bullard[1] contend the court's aiding and abetting instruction (CALJIC No. 3.01) improperly allowed the jury to convict them of murder based on imputed malice; the jury's findings of premeditation were not supported by substantial evidence; and the trial court effectively vouched for the accuracy of the People's evidence when overruling a defense objection during closing argument. They also contend the court erred in denying Bullard's motion to bifurcate the gang enhancements and, even if the ruling denying bifurcation was proper when made, section 1109, part of Assembly Bill No. 333 (Stats. 2021, ch. 699, § 3) (Assembly Bill 333), effective January 1, 2022, mandating bifurcation of gang enhancements when requested, is retroactive to cases not yet final and requires reversal of their convictions. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Information*

An information filed May 21, 2020 charged Tucker and Bullard with murder (Pen. Code, § 187, subd. (a))[2] (count 1) and

---

[1]     Tucker and Bullard have joined the arguments in each other's separate briefs to the extent pertinent. (Cal. Rules of Court, rules 8.200(a)(5), 8.360(a).)

[2]     Statutory references are to this code.

Bullard with possession of a firearm by a felon (§ 29800, subd. (a)(1)) (count 3).[3]

The information specially alleged the murder had been committed to benefit a criminal street gang (§ 186.22, subd. (b)(1)(C)),[4] Bullard personally used and intentionally discharged a firearm causing death (§ 12022.53, subds. (b), (c), (d)) and a principal intentionally discharged a firearm causing death (§ 12022.53, subds. (c), (d), (e)(1)). It also alleged Bullard's firearm offense was committed to benefit a criminal street gang. (§ 186.22, subd. (b)(1)(A).)

Finally, the information specially alleged Tucker and Bullard had each suffered a prior conviction for a serious felony within the meaning of section 667, subdivision (a), and a prior conviction for a serious or violent felony within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12).

Tucker and Bullard pleaded not guilty and denied the special allegations.

2. *The Evidence at Trial*

a. *The bar fight and shooting*

In January 2019 Johnisha Brown asked her boyfriend, Maurice Ross, to meet her at a Long Beach bar known to be a

---

[3] The information also charged a third defendant, Rodney Willis, with first degree murder and being a felon in possession of a firearm. Willis, who was tried together with Tucker and Bullard, is not a party on appeal.

[4] At times we employ the shorthand "to benefit a criminal street gang" to mean for the benefit of, at the direction of or in association with a criminal street gang with the specific intent to promote, further or assist in criminal conduct by gang members. (See § 186.22, subd. (b)(1).)

hangout for the Insane Crips criminal street gang. Brown had been invited to the bar by her friend, Sharell Johnson, who was bartending there. Before Ross arrived, Brown had asked Johnson if there were "any gangbangers" in the bar, telling her Ross was a member of the Bloods, a rival of the Insane Crips. Johnson assured her there were not.

Brown left the bar briefly to meet Ross at the nearby train station. Rodney Willis, an associate of the Insane Crips, was at the bar speaking with Johnson when Brown returned with Ross. Brown and Ross sat down at the bar; Willis sat at a table behind them. Shortly thereafter Tucker and Bullard arrived at the bar in Tucker's SUV. Willis stepped outside to meet them. Willis spoke to Tucker and Bullard for a few minutes before all three men entered the bar together.

Inside the bar Ross used Brown's cell phone to record himself making gang signs indicating his membership in the Bloods. Brown told him to stop. Ross left the table to use the restroom. When Ross returned, he saw Bullard speaking with Brown and confronted him about flirting with his girlfriend. Bullard apologized. Ross and Brown went outside to smoke. Tucker, Bullard, Willis and several other individuals followed them. Outside the bar Bullard and Ross shook hands, seemingly diffusing any animosity between them. Willis, however, remained very angry that Ross was in Insane Crips territory and began "gangbanging Ross." Ross said to someone else in the group, "What's up with you weird ass Long Beach Niggas?" Willis took that comment as a sign of disrespect. Willis identified himself as "Eastside Insane," and he or Tucker told Ross he was in the wrong city. Ross responded he "fucks with Eastside." The confrontation escalated. Bullard and Willis backed Ross up

4

against the building.  Willis swung at Ross with a closed fist as if to punch him in the face, but Willis missed and fell to the ground. Ross ran away.  Brown followed Ross at a slower pace.

Willis ran back to the bar to go inside; but, when Johnson stopped him from entering, he immediately ran after Ross while Bullard walked slowly behind them.  Tucker, too, followed. Tucker and Willis suddenly changed direction and ran back toward the bar and Tucker's SUV.  As Tucker ran past Brown, she heard him shout, "I'm going to get the blower," which Brown interpreted to mean a gun.  Brown yelled at Ross to run.  Tucker got into the driver's seat of his SUV; Bullard entered the SUV on the front passenger's side; and Willis, who had retrieved his backpack from the bar, joined them in the vehicle.  The group drove toward the train station.  When they saw Ross on the train platform, Tucker stopped the SUV; and all three men ran out. Willis and Tucker chased Ross; Bullard got into the driver's seat.

Willis caught up to Ross; and Ross hit him in the face, causing Willis to fall to the ground and chip a tooth.  Ross fled. When Ross ran behind the SUV, Bullard drove the car in reverse as if trying to strike Ross.  Ross managed to escape being hit, but seconds later two residents (a husband and wife) of a nearby apartment building saw the driver of the SUV extend his arm out the window with what appeared to be a gun and heard several gunshots.  (At trial the husband stated he had early onset dementia and could not remember what he had told police the night of the shooting.  The wife remembered telling police she saw the shooting, but acknowledged she was not sure if what she saw in the driver's hand was a gun.  She did know the object was shiny, and she heard gunshots right after seeing it.)

Brown, who had followed Ross and was near the passenger's side of the SUV when the gunfire occurred, also heard the shots and saw muzzle flashes coming from the SUV's driver's side. Brown was certain the driver, whom she did not see, was the shooter. Because she had seen Tucker drive away from the bar to follow Ross, Brown believed Tucker was the driver. Surveillance footage indicated Bullard was driving by the time the shooting occurred.

Ross was shot in the back and killed. Brown saw the SUV speed away from the scene. Tucker hid the SUV with friends and relatives.

After the shooting Willis ran back to the bar. He was later picked up at the bar in a car belonging to Bullard.

Most of the confrontation inside and outside the bar and the ensuing chase was captured on surveillance cameras. The footage was played for the jury. The shooting itself was not recorded by surveillance cameras.

b. *Willis's custodial interview*

Bullard and Tucker were arrested a few weeks after the shooting. Willis remained at large for several months until he turned himself in. During his custodial interview Willis said he heard Brown and Johnson talking and had known Ross was a member of the Bloods before Ross arrived at the bar. When Ross disrespected the Insane Crips, Willis chased Ross intending to beat him up, not shoot him. Willis said he had been drinking alcohol all day and was very drunk. He withdrew his semiautomatic nine-millimeter gun from his pocket and fired his weapon only after hearing a gunshot and a window shatter above him; he believed someone was shooting at him. Willis said he did not intend to kill anyone. He did not show his gun to Tucker or

Bullard and did not know about any gun in the SUV other than the one he carried with him. He claimed the fight happened because everyone was drunk. It had nothing to do with "gangster shit."

c. *The People's ballistics evidence*

No firearm was ever recovered. Police found seven cartridge casings from a nine-millimeter semiautomatic gun on the corner of Anaheim Street and Locust Avenue; four bullet fragments found nearby were also from a nine-millimeter weapon. While all the fragments came from a single weapon, and all the casings came from a single weapon, it could not be determined if the casings and fragments came from the same weapon. Another bullet fragment found inside a building was too small to determine whether it came from the same gun as the casings or other fragments. Police discovered an oval-shaped bullet hole in a window of a business at 205 E. Anaheim Street where Willis had said he had heard a window shatter. The People's firearms expert acknowledged that she did not conduct a bullet trajectory analysis.

d. *The People's gang expert*

Long Beach Police Officer Fernando Archuleta testified as an expert on the Insane Crips. Archuleta stated the bar was located in Crips territory and frequented by Insane Crips. Based on Tucker's tattoos and Willis's statements, Archuleta opined Tucker was an Insane Crips member and Willis an associate. Archuleta was not personally aware whether Bullard belonged to any gang. Asked by the prosecutor about Bullard's tattoo of the number 211, Archuletta briefly stated he was familiar with the number "because that's the Penal Code for robbery" and there is a Crips gang located in the City of Lynwood called the 211 Crips.

He also stated Bullard had told him one time during a traffic stop that he was from Lynwood.  On cross-examination Archuleta clarified he had no expertise concerning the 211 Crips and no knowledge whether Bullard's 211 tattoo signified membership in any gang.  Archuleta opined, based on a hypothetical scenario resembling the facts of the case, that the shooting was committed to benefit the Insane Crips.

The jury also heard evidence the primary activities of the gang included robberies, burglaries, batteries, possession of firearms and narcotics sales, "escalating up to shootings that result in murders."  Long Beach Police Officer Chris Zamora also presented evidence of the gang's predicate acts:  One Insane Crips gang member pleaded guilty to voluntary manslaughter in 2014, and another was convicted of murder and attempted robbery with a gang enhancement in 2010.

e.  *The People's theory of the case*

The People argued there were two shooters:  Willis and Bullard.  The prosecutor told the jury it did not have to decide which man shot the bullet that killed Ross to find all three men guilty of first degree premeditated murder.  According to the People's theory of the case, Willis, Bullard and Tucker had joined together in a planned effort to hunt down Ross and kill him in retaliation for Ross's disrespect of the Insane Crips in its territory.

f.  *The defense case*

Tucker and Bullard did not testify.  Willis, testifying in his own defense, told a somewhat different story from the one he related during his custodial interview.  Although he told police he fired his gun only after hearing a gunshot, Willis testified that on reflection he did not think the sound he had heard was a gunshot

8

and believed he had been the only shooter.  He later said he lied to police when he told them he had heard a gunshot.

David Kim, a forensic criminalist, opined, based on his experience, the location of the bullet casings and his trajectory analysis, the shot that killed Ross could not have come from any of the occupants in the SUV.

The defendants' counsel presented different theories of the case.  Bullard's counsel argued Bullard entered the SUV with Tucker not as part of a plan to hunt down Ross, but because Tucker was his ride home.  When he got in the SUV, Willis had not yet jumped in with his backpack, which Bullard's counsel, like the prosecutor, argued contained the gun used in the shooting.  Then, when Tucker stopped the SUV to chase Ross, Bullard moved to the driver's seat to drive the car away from traffic, not to chase Ross.  And, counsel noted, there was no evidence Bullard was in any gang or had any interest in assisting Tucker or Willis in retaliating for Ross's disrespect of the Insane Crips.  As for the witnesses' testimony the SUV driver had fired a gun several times, Bullard's counsel posed an alternative theory: Bullard had stopped the SUV to pick up Tucker at the same time Willis, chasing Ross on foot, shot at Ross, leading witnesses to believe, erroneously, that the shots were from the SUV, not from Willis's location on the street or sidewalk.  Emphasizing the testimony of the defense ballistics expert, Bullard's counsel argued, based on the number and location of the bullet casings and the trajectory analysis, Willis fired the shots, not anyone in the SUV.

Tucker's counsel argued similarly, adding, the words, "I'll get the blower," if said at all, were uttered by Willis, who was closer to Brown than Tucker when she heard the comment.  He

9

argued there was no evidence Tucker had been armed or knew Willis was armed and that the evidence showed only an intent by Tucker to beat Ross up, not a premeditated plan to kill him.

Willis's counsel articulated a different theory. Highlighting Brown's testimony about the shooting, including her testimony that she had kept her eyes on Willis as he chased Ross and never saw him with a gun, Willis's counsel argued that Willis had not been armed and was not the shooter. He also argued, using the defense trajectory analysis, one of the bullet fragments could not have come from Willis's location on the sidewalk. As for Willis's motive to lie about his role in the shooting, his counsel argued, based on testimony from the gang expert, it was common for gang members or associates to take the blame to protect a more senior member. Willis's counsel argued in the alternative, even if the jury found Willis was armed and had fired his weapon, Willis was heavily intoxicated and unable to formulate a specific intent to kill, let alone do so with premeditation and deliberation.

3. *Jury Instructions*

The court instructed the jury on, among other things, murder (CALJIC No. 8.10), premeditation and deliberation (CALJIC No. 8.20) and direct aiding and abetting (CALJIC Nos. 3.00, 3.01).

4. *Verdict and Sentence*

The jury found Tucker and Bullard guilty of first degree premeditated murder and Bullard guilty of being a felon in possession of a firearm. The jury found true as to both men the enhancement allegation that a principal had intentionally discharged a firearm causing death and found not true the special allegation that Bullard had personally used or intentionally discharged a firearm causing death. The jury found

10

all gang enhancements true.[5]  The court denied Tucker's and Bullard's new trial motions, finding the evidence sufficient to support the verdict.

In a bifurcated proceeding Tucker and Bullard admitted they each had suffered a prior serious or violent felony under the three strikes law and a serious felony under section 667, subdivision (a).  The court sentenced Tucker and Bullard to 50 years to life, 25 years to life for first degree premeditated murder, doubled under the three strikes law.  The court struck all other special allegations, including the firearm enhancement, gang enhancement, and the section 667, subdivision (a), serious felony enhancement in the interest of justice.

## DISCUSSION

1. *The Trial Court Properly Instructed the Jury on Direct Aiding and Abetting Principles*

a. *Governing law*

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).)  Malice may be express or implied.  Malice is express when there is intent to kill.  (§ 188, subd. (a)(1).)  It is implied when the killing is proximately caused by an act, the natural consequences of which are dangerous to human life and the act was deliberately performed by a person who knows that his or her conduct endangers human life and acts in conscious disregard for human life.  (*People v. Reyes* (2023) 14 Cal.5th 981, 988.)

If the murder is "willful, deliberate, and premeditated," it is first degree murder.  (§ 189, subd. (a); see *People v. Brooks* (2017)

---

[5]  At the time the jury returned its verdicts for Tucker and Bullard, it had not reached a verdict on the charges against Willis.  The record does not reflect the outcome of Willis's trial.

11

3 Cal.5th 1, 58.) "'"'[P]remeditated' means 'considered beforehand,' and "deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.'"'" (*People v. Potts* (2019) 6 Cal.5th 1012, 1027.) "'"An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.'" [Citations.] 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' [Citation.] Such reflection may be revealed by planning activity, motive and the manner of the killings, among other things." (*Id.* at p. 1027.)

For a person to be liable as a direct aider and abettor of express malice murder, the prosecution must prove the "defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*In re Lopez* (2023) 14 Cal.5th 562, 579; accord, *People v. Reyes*, *supra*, 14 Cal.5th at pp. 990-991 ["'[d]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea'"]; *People v. McCoy* (2001) 25 Cal.4th 1111, 1122.) When an aider or abettor, with his or her own mens rea of premeditation and deliberation, knowingly and intentionally assists a confederate to kill someone, the aider and abettor is guilty of first degree premeditated murder. (*In re Lopez*, at p. 579.)

To be liable for an implied malice murder as an aider or abettor, "'the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering act, not the result of

12

that act.  The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.'" (*People v. Reyes*, *supra*, 14 Cal.5th at p. 991.)

### a. *CALJIC 3.01 did not permit the jury to impute the perpetrator's express malice to Tucker*

In addition to instructing the jury on murder and premeditation and deliberation, the court instructed the jury with CALJIC No. 3.01 on aiding and abetting:  "A person aids and abets the commission of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2)  With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice, aids, promotes, encourages or instigates the commission of the crime.  [¶]  A person who aids and abets the commission of a crime need not be present at the scene of the crime.  [¶]  Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting. [¶]  To be guilty as an aider or abettor, the defendant's intent or purpose of committing or encouraging or facilitating the commission of the crime by the perpetrator must be formed before or during the commission of the crime.  [¶]  Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting."

While acknowledging that CALJIC No. 3.01 accurately states the law of aiding and abetting in general and that he was tried as a direct aider and abettor and not under the natural and probable consequences doctrine or some other theory of imputed

malice,[6] Tucker nonetheless contends CALJIC No. 3.01 in this case improperly permitted the jury to find him guilty of first degree premeditated murder based solely on his participation in an aggravated assault. Tucker's reliance on *People v. Powell* (2021) 63 Cal.App.5th 689 (*Powell*), *People v. Langi* (2022) 73 Cal.App.5th 972 (*Langi*) and *People v. Maldonado* (2023) 87 Cal.App.5th 1257 (*Maldonado*) to support this argument is misplaced.[7]

In *Powell, supra,* 63 Cal.App.5th 689 the defendants were convicted of second degree murder for the stabbing death of the victim. The jury was instructed under two theories of accomplice

---

[6] Before the Legislature substantially modified the law relating to accomplice liability for murder in Senate Bill No. 1437 (stats. 2018, ch. 1015, § 1), a person could be convicted of murder based on imputed malice—that is, without the mens rea required for murder—under the natural and probable consequences doctrine or the felony-murder rule. (See *People v. Gentile, supra,* 10 Cal.5th at pp. 844-845.) Senate Bill No. 1437 eliminated the natural and probable consequences doctrine as a basis for finding murder liability (*Gentile,* at pp. 842-843) and significantly narrowed the felony-murder exception to the malice requirement for murder. (See §§ 188, subd. (a)(3), 189, subd. (e).)

[7] We determine independently whether a jury instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) We consider the correctness of the instructions from the entire charge of the court, and not from a single instruction. (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016; *People v. Quinonez* (2020) 46 Cal.App.5th 457, 465-466.) Where there is an ambiguity, "we inquire whether there is a reasonable likelihood that the jury misunderstood or misapplied the instruction in a manner" that violates due process. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 906.)

liability for second degree murder: (1) the then-permissible imputed malice theory of culpability under the natural and probable consequences doctrine (CALCRIM No. 403) with the target offense assault with force likely to produce great bodily injury, and (2) direct aiding and abetting (CALCRIM No. 401).[8] On appeal one of the defendants, Langlois, argued as a matter of law an aider or abettor could not be found guilty of an implied malice murder under a direct aiding and abetting theory because such a murder was based solely on the natural and probable consequences of the perpetrator's act. The *Powell* court properly rejected that argument, citing *People v. Gentile* (2020) 10 Cal.5th 830, 847 (describing the difference between imputed malice, which requires no mens rea for murder, and implied malice, which does). (*Powell,* at p. 713; see also *People v. Reyes, supra,* 14 Cal.5th at p. 990 [aiding and abetting an implied malice

---

[8]    CALCRIM No. 401 and CALJIC No. 3.01 are substantially similar. CALCRIM No. 401 provides, "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. [¶] If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor."

murder remains a valid theory of murder liability notwithstanding Senate Bill No. 1437's amendments to sections 188 and 189].)

However, the *Powell* court agreed with Langlois that CALCRIM No. 401's aiding and abetting instruction was not well suited to the crime of implied malice murder. "[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea." (*Powell, supra*, 63 Cal.App.5th at pp. 712-713, citing *People v. McCoy, supra*, 25 Cal.4th at p. 1122.) In the context of implied malice, the *Powell* court wrote in language subsequently quoted in *People v. Reyes, supra*, 14 Cal.5th at page 991, the actus reus required of the perpetrator is the commission of a life-endangering act. "For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering *act,* not the result of that act. The mens rea . . . is knowledge that the perpetrator intended to commit *the act,* intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life." (*Powell*, at pp. 712-713.) By couching "direct aiding and abetting liability in terms of the aider and abettor knowing the perpetrator intended to commit *the crime*, the aider and abettor intending to aid and abet the perpetrator in committing *the crime*, and that, by words or conduct the aider and abettor in fact aided the perpetrator's commission of *the crime*," the instruction failed to properly focus on the aider and abettor's knowledge the perpetrator's act was dangerous to human life and conscious disregard for that danger. (*Id.* at p. 714.) In this way, the court held, CALCRIM No. 401 was "not tailored for" an implied malice murder. (*Ibid.*)

In the case before it, however, the *Powell* court held any error in the instruction was harmless beyond a reasonable doubt. (*Powell, supra*, 63 Cal.App.5th at p. 714.)  The court explained that the People did not argue Langlois was guilty as a direct aider and abettor of an implied malice murder; they argued he directly aided and abetted an express malice murder or he was guilty of second degree murder under the natural and probable consequences doctrine.  Because the jury necessarily found Langlois guilty of second degree murder either under the easier-to-prove natural and probable consequences doctrine or as a direct aider and abettor of an express malice murder, the failure to tailor CALCRIM No. 401 to implied malice murder was necessarily harmless.  (*Powell*, at pp. 715-716.) [9]

In *Langi, supra,* 73 Cal.App.5th 972 a defendant convicted in 2007 of second degree murder for the beating death of the victim petitioned the court under section 1172.6 (former section 1170.95), seeking resentencing on the ground he had been convicted under a theory of imputed malice.  While acknowledging the jury had not been given a natural and probable consequences instruction (and the jury found him not guilty of felony murder), the court, citing *Powell, supra*, 63 Cal.App.5th 689, found CALJIC No. 3.01 effectively permitted

---

[9]    The *Powell* court did not consider the validity of Langlois's conviction under the natural and probable consequences doctrine because the Supreme Court had held Senate Bill No. 1437's amendments eliminating the natural and probable consequences doctrine as a theory of accomplice liability for murder could only be raised by a petition for postconviction relief. (*People v. Gentile, supra*, 10 Cal.5th at pp. 854-855.)  The Legislature subsequently provided that a defendant could raise the argument on direct appeal.  (See § 1172.6, subd. (g).)

17

the jury to find he had aided and abetted a second degree murder based on his participation in "the crime," without having to find he aided the perpetrator with knowledge of, and conscious disregard for, the fact the perpetrator's act was dangerous to human life.  Because the court could not conclude as a matter of law that the jury did not find the defendant guilty of an implied malice murder based on an improper theory, the court reversed the order finding the defendant ineligible for resentencing relief as a matter of law and remanded the matter for an evidentiary hearing.  (*Langi*, at p. 984.)

The *Powell/Langi* analysis concerning the propriety of CALCRIM No. 401 and CALJIC No. 3.01 in cases involving implied malice murder does not assist Tucker.  The People's theory of the case was that Tucker was guilty of aiding and abetting an express malice murder.  The jury, properly instructed as to premeditation and deliberation and aiding and abetting, found Tucker guilty of first degree murder, necessarily concluding he had harbored both express malice and the elevated mens rea of premeditation and deliberation.  (Cf. *People v. Coley* (2022) 77 Cal.App.5th 539, 547 [when jury convicted appellant of attempted murder, it necessarily found intent to kill, express malice; *Powell* and *Langi*, which found CALCRIM No. 401 and CALJIC No. 3.01 "ill suited" to implied malice murder cases, are inapposite].)

Misreading *Maldonado*, *supra*, 87 Cal.App.5th 1257, Tucker contends *Powell* and *Langi*'s analysis is not limited to second degree murder cases and applies to first degree premeditated murder.  In *Maldonado* a defendant convicted in 2013 of first degree lying-in-wait murder petitioned the court under section 1172.6 for postconviction relief, arguing CALCRIM

No. 401 permitted the jury to convict him based on his participation in the crime and not on the proper mental state required for implied malice murder. The court agreed because first degree lying-in-wait murder, unlike first degree premeditated murder, could be accomplished with implied rather than express malice, making use of CALCRIM No. 401 problematic: "The People argue *Powell* and *Langi* are distinguishable because the convictions in those cases were for second degree murder, while appellant was convicted of first degree murder. The distinction is immaterial because, as explained above, first degree lying-in-wait murder can be based on a theory that the perpetrator acted with implied malice rather than an intent to kill. *Powell* and *Langi*'s analyses of the standard instructions for aiding and abetting an implied malice murder apply here." (*Maldonado*, at p. 1267.)

As discussed, the People argued at trial, and the jury found, that Tucker was guilty as an aider and abettor of an express malice, premeditated murder. The court's instructions on premeditation and deliberation, together with CALJIC Nos. 3.00[10] and 3.01, ensured that Tucker was convicted as a direct aider and abettor based on his individual mental state and

_____

[10] In addition to CALJIC No. 3.01, the court instructed the jury with CALJIC No. 3.00: "When the crime charged is murder, the aider and abettor's guilt is determined by the combined acts of all the participants as well as that person's own mental state. If the aider and abettor's mental state is more culpable than that of the actual perpetrator, that person's guilt may be greater than that of the actual perpetrator. Similarly, the aider and abettor's guilt may be less than the perpetrator's if the aider and abettor has a less culpable mental state."

not simply his participation in the crime.  Whether we find it is not reasonably possible the jury interpreted the instructions in the manner Tucker suggests or that any error in the instruction is harmless in light of the jury's premeditation and deliberation findings (cf. *Powell, supra,* 63 Cal.App.5th at pp. 715-716), the result is the same:  Tucker's conviction for first degree premeditated murder stands, provided it is supported by substantial evidence.[11]

2. *Substantial Evidence Supports the Jury's Findings of First Degree Premeditated Murder for Both Tucker and Bullard*

a. *Standard of review and governing law*

In considering a claim of insufficient evidence in a criminal case, "a reviewing court considers the entire record in the light most favorable to the judgment below to determine whether it contains substantial evidence—that is, evidence which is reasonable, credible, and of solid value—from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1068-1069.) "In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.]  'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor

---

[11]  Bullard joined in Tucker's CALJIC No. 3.01 argument. (See footnote 1.)  It fails in his appeal for the same reasons.

20

evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; accord, *People v. Dalton* (2019) 7 Cal.5th 166, 243-244; *People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 the Supreme Court "identified three categories of evidence that tend to establish a premeditated and deliberate murder—"planning, motive, and method." (*People v. Ghobrial* (2018) 5 Cal.5th 250, 278.) But "these factors do not "'exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation.""" (*People v. Lopez* (2018) 5 Cal.5th 339, 355.) Rather, "'[t]hey are simply an "aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.""" (*Ghobrial*, at p. 278; accord, *People v. Gonzalez* (2012) 54 Cal.4th 643, 663.)

b. *Tucker*

Tucker contends there was insufficient evidence to support the jury's finding he aided and abetted Ross's murder, let alone did so with premeditation and deliberation, arguing the primary evidence of premeditation was his statement, "I'm going to get the blower," which Brown claimed meant a gun. Yet, he asserts, there was no evidence that Brown had any expertise in street language or that her understanding of "blower" as a slang term for a firearm was correct. And, given the surveillance video footage showing him running to his SUV, a Range Rover, it was

21

far more likely he had said, "I'm going to get the Rover." In addition, the prosecutor confused the matter during argument when he coupled Tucker's statement about "getting the blower" with Willis's retrieval of his backpack, indicating Tucker had commanded Willis to get a weapon.[12] Without his statement, Tucker argues, the evidence at most establishes an intent to aid and abet a fistfight, not a planned murder.

At the threshold, the contention Brown misunderstood what Tucker had said was a matter for the jury, not this court. Tucker does not argue Brown's testimony was improperly admitted; and his trial counsel argued its weight to the jury (albeit without the Rover-reference argument Tucker's counsel makes on appeal).

The evidence, including Brown's testimony, viewed in the light most favorable to the prosecution, amply supported the jury's findings. Tucker, an Insane Crips gang member, angry at Ross's insult of his gang, chased Ross on foot. He stopped the chase and returned to the bar telling his confederates, "I'm going to get the blower," which Brown interpreted to mean a gun. Tucker and Bullard got in the SUV; and Tucker waited for Willis to return to the car with his backpack, which the prosecutor and Willis's counsel argued contained Willis's firearm, before driving in pursuit of Ross.

---

[12]    During closing argument the prosecutor, referring to the surveillance footage, commented, without objection, "This is where Mr. Tucker says, 'get the blower.' And immediately Mr. Willis goes into the bar to get his backpack because that's where one of the guns is. There is no other reason why Mr. Willis goes into that bar except to get his gun. And now they're going to chase him down."

Tucker asserts there was no evidence he was armed and no direct evidence he knew Willis or Bullard was, emphasizing Willis's testimony that Willis did not tell anyone he had a gun. Tucker made the same arguments to the jury, which rely on favorable inferences drawn from the testimony and Willis's credibility and ignore less favorable ones from the People's case. There was substantial evidence of motive (gang retaliation), planning (however brief) and intent to kill to support the jury's finding of first degree premeditated murder.

c. *Bullard*

Emphasizing that the jury found not true the special allegation he had personally used or discharged a weapon resulting in death, Bullard argues the jury necessarily found he was not the shooter.[13] To find him guilty of first degree murder, he continues, the jury had to find he was an aider and abettor acting with premeditation and deliberation. But, he argues, he had no motive—he was not an Insane Crips gang member—and was not so near Tucker when he referred to getting the "blower" to necessarily hear Tucker's words or to know that Tucker and Willis intended to arm themselves and kill Ross. Bullard got into the SUV because Tucker was his ride home, not as part of a murderous plan. He was simply "in the wrong bar at the wrong time with the wrong friend."

Bullard's premise that the jury necessarily determined he was not the shooter misapprehends the legal significance of the jury's firearm enhancement findings. Inconsistent findings on a

---

[13] Although the jury found Bullard guilty of being a felon in possession of a firearm, he explains the jury necessarily found only that he had "constructive" possession of a firearm, not that he used it. (See CALJIC No. 12.44.)

substantive offense and a related enhancement are valid provided the guilty verdict on the substantive charge is supported by substantial evidence.  (*People v. Brugman* (2021) 62 Cal.App.5th 608, 623; *People v. Miranda* (2011) 192 Cal.App.4th 398, 406; see generally *People v. Lewis* (2001) 25 Cal.4th 610, 656 ["it is well settled that, as a general rule, inherently inconsistent verdicts are allowed to stand"; "[a]n inconsistency may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict"].)

There was certainly substantial evidence that Bullard was the shooter.  Witnesses saw the driver of the SUV, which surveillance footage indicated was Bullard, extend his arm to shoot; the apartment's residents heard gun shots immediately after seeing the driver extend his arm; and Brown saw muzzle flashes from the driver's side of the car.

Moreover, whether or not he was the shooter, substantial evidence established Bullard's guilt as an aider and abettor of first degree premeditated murder.  While Bullard may have sought in the beginning to hold himself apart from any dispute between Willis and Ross, that changed outside the bar when Bullard assisted Willis in backing Ross up against a wall.  Then, despite several chances to remove himself, he left with his confederates to find Ross; got into the driver's side of the SUV when Tucker and Willis fled the SUV to chase Ross on foot; and, instead of leaving the scene, backed up the SUV and attempted to run over Ross, further evidencing an intent to kill.

As for Bullard's claimed lack of motive, the jury was not required to find Bullard was a gang member or associate to conclude he aided and abetted his friends who were.  The evidence in the record fully supported the jury's findings that,

whether the shooter or an aider or abettor, Bullard, together with Tucker and Willis, hunted Ross down with the plan to kill him. Bullard, like Tucker, may posit different inferences from the evidence—and his counsel ably argued that more favorable interpretation to the jury—but our task is simply to determine whether the jury's finding was supported by substantial evidence. It was.

  3. *The Court's Rulings and Comment During Closing Argument, If Error at All, Were Not Prejudicial*

    a. *Relevant proceedings*

During cross-examination the prosecutor questioned the defense firearms expert, David Kim, about the trajectory of the shot that hit the window of the building at 205 E. Anaheim Street. Referring to defense exhibit M., a photograph used by Bullard's counsel, and assuming Tucker's SUV had been located where the police car in the photograph was, the prosecutor asked, "Is that a possible trajectory from the car?" Kim responded, "It's a better trajectory assumption than somebody shooting from across the street." However, Kim explained the location of the bullet casings made it virtually impossible that the shot was fired from the SUV. The prosecutor asked Kim to ignore the location of the bullet casings and to focus on the bullet trajectory. If the SUV had been in the same location as the police car depicted in the photograph, "Is that a possible location" to explain bullet fragment number 13 found in the apartment building? Kim responded, "Just the proximity of the police car, yes."

During his initial closing argument the prosecutor stated, "Even Mr. Bullard's firearm expert says the shot came from here," referring to an image showing a parked police car at the

location of the shooting.[14] Bullard objected, arguing the prosecutor had misstated the evidence. The court overruled the objection stating, "This is for the jury to determine."

In his closing argument Bullard's counsel responded to the prosecutor's statement: "I just want to address it right now, some of the misstatements" that the prosecutor made. "So one of the misstatements he said—he said that my expert said that—this location where I'm pointing to in the intersection where testimony that the Range Rover was parked, he said that my expert said that was the trajectory of item 13. He never said that. In fact, he said it is virtually impossible. That is a clear misstatement to say that my expert said that the possible trajectory of a person from this shooting position ended up in this building which resulted in fragment number 13. The other thing he said he had ballistic evidence . . . that shot 13 occurred here. You heard there is no trajectory evidence presented in this case by the prosecution because they did not take trajectory measurements."

In his final closing argument the prosecutor, referring to a photograph that was not defense exhibit M, repeated that the trajectory of the bullet resulting in fragment number 13 from the police car shown in the photograph made sense and then asserted, "Lo and behold, guess who is there? A car driven by Mr. Bullard." Bullard's counsel objected, asserting the prosecutor was using a different photograph from the one he and the prosecutor had shown Mr. Kim at trial and had again misstated the evidence. The court overruled the objection. The court stated

---

[14] The record does not indicate whether the prosecutor's argument referred to the police car depicted in defense exhibit M or some other image.

the photograph was similar, reminded counsel this was argument and "[i]t's up to the jury to decide." The prosecutor continued, "[Fragment] number 13 is right here in this building. Again Mr. Kim said he would expect that shooter to be right here." Bullard's counsel objected once more, asserting the prosecutor was misstating the evidence. The court replied, "It is not, [counsel]. This is argument. I remember this testimony. Overruled."

At the conclusion of the prosecutor's argument, outside the presence of the jury, Bullard's counsel made his record: "He [the prosecutor] made an argument that both cars were in the same position and he used a photograph that was not . . . the photograph that I asked Mr. Kim about. So he misrepresented the placement, and he misrepresented Mr. Kim's testimony as to the placement." The court reminded defense counsel that the prosecutor did not have to accept the defense theory of the SUV's location; there was other evidence (from Brown and the husband and wife) that placed the SUV in the same location as the police car in the photograph; and the prosecutor could argue inferences based on that evidence.

b. *The court did not commit prejudicial error*

Expressly stating his argument is not one of prosecutorial misconduct, Bullard contends the court erred when it overruled the objections of Bullard's trial counsel and compounded the error by vouching for the accuracy of the prosecutor's characterization of the evidence.

We agree the prosecutor's comment in his initial closing argument that "[e]ven Mr. Bullard's firearm expert says the shot came from here" was imprecise, if not misleading: Kim testified the shot could have come from the location of the parked police

27

car depicted in the photograph only if the jury ignored the location of the casings.  Nevertheless, the court reminded the jury this was argument and the jury was to decide the state of the evidence for itself.  And, as Bullard acknowledges, defense counsel clarified Kim's testimony for the jury in his closing argument.

Bullard contends, however, that his counsel had no opportunity to eliminate the prejudice from the prosecutor's similar misstatements in rebuttal.  But in rebuttal the prosecutor properly focused on Kim's trajectory analysis, telling the jury the trajectory of bullet fragment number 13 would make sense, then adding, "Lo and behold, guess who is there.  A car driven by Mr. Bullard."  The prosecutor did not say Kim's analysis placed the car in that location.  To be sure, the prosecutor went on to remark that Kim had "expected" the shooter to be in a particular location when Kim had actually testified it was "possible."  Still, the nature of that characterization is sufficiently ambiguous to be within the bounds of reasonable comment on the evidence (see *People v. Martinez* (2010) 47 Cal.4th 911, 957 [prosecutor has significant leeway in commenting on state of the evidence and may draw reasonable inferences and deductions]; *People v. Wilson* (2005) 36 Cal.4th 309, 337); and the court reminded the jury, during counsel's arguments and in its oral and written instructions, that argument was not evidence.

Although the court may well have overstepped when, after overruling Bullard's objection it added, "I remember that testimony," the court did not vouch for the veracity of the prosecutor's evidence; it only indicated there was evidence for the jury to consider.  The court made clear numerous times throughout argument that the accuracy of counsel's

characterizations was for the jury to decide.  On this record the court's brief comment, even if improper, did not rise to the level of prejudicial error.

### 4. *Assembly Bill 333's Changes to the Gang Enhancement Statutes Do Not Require Reversal*

#### a. *Governing law*

Assembly Bill 333 significantly modified the procedural and substantive requirements for trying and proving gang enhancements.  Under the principles enunciated in *In re Estrada* (1965) 63 Cal.2d 740, Assembly Bill 333's amendments to section 186.22 increasing the threshold for proving a gang participation offense and gang enhancements apply retroactively to defendants whose convictions are not yet final.  (*People v. Tran* (2022) 13 Cal.5th 1169, 1207; accord, *Rodas v. Superior Court* (2023) 92 Cal.App.5th 656, 659.)

Assembly Bill 333 also added section 1109, which requires, when requested by the defendant, that a gang enhancement charged under section 186.22, subdivision (b), be tried separately from, and after, determination of the defendant's guilt of the underlying offense.  (§ 1109, subd. (a) (Stats. 2021, ch. 699, § 5).)  Whether section 1109 applies retroactively has not yet been definitively determined.  (Compare *People v. Burgos* (2022) 77 Cal.App.5th 550, review granted July 13, 2022, S274743 [holding section 1109 is retroactive to nonfinal cases]; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1129 [same]; *People v. Montano* (2022) 80 Cal.App.5th 82, 108 [same] with *People v. Boukes* (2022) 83 Cal.App.5th 937, 948, review granted Dec. 12, 2022, S277103 [section 1109 is not an ameliorative statute that reduces punishment; accordingly, it does not apply retroactively];

*People v. Ramirez* (2022) 79 Cal.App.5th 48, 65, review granted Oct. 12, 2022, S275341 [same].)

> b. *Because the court struck the gang enhancement allegations as to both Tucker and Bullard, their challenges to the sufficiency of the evidence are moot*

Bullard and Tucker contend the evidence is insufficient to support the jury's gang enhancement finding under the iteration of section 186.22 in effect at the time of trial. They also contend, and the People agree, that remand is required for retrial under the additional requirements of proof imposed under Assembly Bill 333. However, the trial court struck the gang enhancement allegations (not just the penalty) in their entirety. Accordingly, any challenge to the sufficiency of the evidence to support the now nonexistent findings is moot, as we cannot provide effective relief. (See generally *In re D.P.* (2023) 14 Cal.5th 266, 276 [mootness arises when events render it impossible for court to grant any effective relief; for relief to be effective, there must be an "ongoing harm" capable of being rectified by the outcome plaintiff seeks].)[15]

> c. *Any error in failing to bifurcate the gang enhancement at trial was harmless*

Bullard and Tucker contend section 1109's bifurcation requirements are retroactive and the failure to bifurcate prejudiced the trial and requires reversal of their convictions.

---

[15]  Because the court struck the gang enhancement allegation and not just the penalty, we cannot conceive of collateral consequences resulting from the jury's finding (cf. *People v. Fuentes* (2016) 1 Cal.5th 218, 225-226), nor do Tucker and Bullard assert there are any.

30

In *People v. Tran, supra*, 13 Cal.5th 1169, the Supreme Court, after recognizing the disagreement in appellate cases concerning section 1109's retroactivity, held it was unnecessary to address the issue because, using a harmless error analysis, the gang evidence would have been admissible even if the gang enhancements were bifurcated. (*Tran*, at p. 1208;[16] see *People v. Session* (2023) 93 Cal.App.5th 723, 734 [even if the gang allegations had been bifurcated, the failure to bifurcate was harmless; "[m]uch of the gang evidence was also admissible to prove guilt"]; *People v. Boukes, supra*, 83 Cal.App.5th at p. 948, review granted ["[e]ven if we were to hold that [section 1109] does apply retroactively, we would find in this case that any error in the lack of bifurcation was harmless"]; *People v. E.H.* (2022) 75 Cal.App.5th 467, 480 ["[e]ven if section 1109 applied retroactively to his case . . . [defendant] cannot show it is 'reasonably probable' he would have obtained a more favorable result if his trial had been bifurcated"].)[17] We follow the Supreme Court's lead and do not address retroactivity because any error in not bifurcating trial of the gang enhancements was unquestionably harmless.

---

[16] The Court held harmless error was to be evaluated under the standard for state law error identified in *People v. Watson* (1956) 46 Cal.2d 818, 836 (error is reversible only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"). (*People v. Tran, supra*, 13 Cal.5th at p. 1208.)

[17] The recent grant of review in *People Boukes, supra,* S277103, deferring decision pending consideration of the related issue in *People v. Burgos, supra,* S274743, suggests the Supreme Court is likely to resolve the conflict.

31

The case at bar was predicated on the motives of Tucker, an Insane Crips gang member, Willis, an associate of that gang, and Tucker's friend Bullard, to kill Ross, a member of the rival Bloods gang, after Ross flaunted his status as a Blood and made derogatory comments about the Crips in their territory. While the limited evidence of the gang's predicate acts would likely have been excluded in a bifurcated trial on the underlying charges, the most damaging aspect of the gang evidence was relevant and admissible.

Bullard contends the error in failing to bifurcate is not harmless as to him because he was not a gang member and thus did not share Willis's or Tucker's motive. But, as discussed, Bullard need not be a gang member or associate to want to assist his friends who are. Bullard was free to, and did, argue at trial his lack of association with the Insane Crips. But the evidence relating to the gang and its rivalry with the Bloods was highly relevant on the underlying charges and the group's (including Bullard's) motive for pursuing Ross after the fight at the bar. Under these circumstances, it is not reasonably probable that bifurcation of the gang enhancements would have resulted in a more favorable result for either Bullard or Tucker.[18]

---

[18] Bullard also contends the court erred in denying his pre-Assembly Bill 333 motion to bifurcate trial of the gang enhancements. Because much of the gang evidence was relevant and not unduly prejudicial, the court was well within its discretion to deny that motion at the time it made its ruling (see *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049-1051); and, as discussed, any error in failing to bifurcate was harmless in any event.

## DISPOSITION

The judgments are affirmed.

PERLUSS, P. J.

We concur:

SEGAL, J.

FEUER, J.